**CITICASTERS LICENSES, INC., Plaintiff,**

v.

**CUMULUS MEDIA, INC.; Cumulus Licensing Corp.; and Cumulus Broadcasting, Inc., Defendants.**

No. CV101–073.

United States District Court, S.D. Georgia, Augusta Division.

March 4, 2002.

R. Perry Sentell, III, James Barrett Trotter, Kilpatrick Stockton, LLP, Augusta, GA, Jonathan C. Balfus, Heenan Blaikie, PC, Beverly Hills, CA, for plaintiff.

David E. Hudson, Hull, Towill, Norman, Barret & Sallet, PC, Augusta, GA, James W. Dabney, Pennie & Edmonds, New York City, for defendants.

## ORDER

BOWEN, Chief Judge.

Both parties have filed preliminary injunction motions. On January 8, 2002, an evidentiary hearing was held on these motions. For reasons set forth below, Plaintiff's motion is **GRANTED**, and Defendants' motion is **DENIED**.

## I. Introduction

This case involves the right to use "KISS" in the name of radio stations located in Savannah, Georgia. Both parties seek to enjoin each other's use of this mark. Defendants operate WSIS–FM, "KISS 104", which is located at 103.9 on the Savannah FM dial. Until recently Plaintiff operated WAEV–97 FM as "MIX 97.3." On December 14, 2001, Plaintiff changed the station name to "97 KISS FM." Plaintiff filed its motion for a preliminary injunction on the same day.

## II. Background

A chronological history of the parties' operations provides the proper background of this lawsuit. Plaintiff owns a radio station named KIIS–FM in Los Angeles, California. Plaintiff or its predecessor began using "KIIS" in Los Angeles as early as December 1, 1984. (Compton Decl. ¶ 5.) On May 23, 1989, Plaintiff's predecessor received official registration of "KIIS" from the United States Patent and Trademark Office.[1] The parties, however, dispute the on-air pronunciation of "KIIS."

In the mid–1990s, Plaintiff began an effort to acquire FM radio stations around the United States. This plan was facilitated by the 1996 Telecommunications Act, 110 Stat. 46, Pub.L. No. 104–104, 1996 S652, which allowed for greater concentration of media ownership. As part of this initiative, Plaintiff wished to identify many of these stations with a common name. In several instances, Plaintiff chose some variation of "KISS FM."

On January 23, 1997, Plaintiff's predecessor filed an application for federal registration of "KISS FM." Included in the application was a logo featuring "KISS FM" with the "i" dotted by a lipsticked

---

1. It should be noted that "KIIS" is not merely a "moniker" chosen by Plaintiff for marketing purposes. KIIS is also the official federal government call sign for the radio station. In this case, Plaintiff's predecessor also chose to register "KIIS" as a trademark.

impression of a pair of lips. Plaintiff's predecessor received official registration from the Patent and Trademark Office on May 12, 1998. At the time this lawsuit was filed, nearly forty radio stations operated or licensed by Plaintiff used the KISS–FM name.

In October or November of 1998, Defendants began operating WSIS–FM in Savannah as KISS 104 or KISS 104 FM. Defendants never received a license from Plaintiff.

Three of Plaintiff's radio stations are relevant to this lawsuit. As mentioned above, Plaintiff operates KIIS–FM in Los Angeles. Using satellite technology, Plaintiff simulcasts KIIS throughout the United States on the XM band. Plaintiff claims it pronounces "KIIS" as "kiss," which would bring it into conflict with Defendants' KISS 104. Plaintiff also owns WKSP–FM in Augusta, Georgia. WKSP broadcasts as "KISS 96", and in certain parts of Burke County, Georgia, a radio listener could receive broadcasts of both Plaintiff's KISS 96 and Defendants' KISS 104.

Most relevant to this lawsuit is Plaintiff's WAEV–97 FM in Savannah. Prior to December 14, 2001, its popular name was "Mix 97.3." On December 14, Plaintiff changed the station name to "97 KISS FM." Now, it directly competes with Defendants' KISS 104. As explained more fully below, this conflict has the potential to substantially undermine the revenues of both stations.

## III. Preliminary Injunction Standard

■ Both parties seek to preliminarily enjoin the other party's use of "KISS" to identify radio stations in the Savannah market. The moving party possesses a burden of persuasion to show: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) its own injury outweighs the injury to the other party; and (4) the injunction

would serve the public interest. *Tally–Ho, Inc. v. Coast Cmty. Coll. Dist.*, 889 F.2d 1018, 1022 (11th Cir.1989). Although the other factors will be discussed, the primary contention is whether either party has shown a substantial likelihood of success on the merits.

## IV. Analysis

### A. *Substantial Likelihood of Success on the Merits*

■ This lawsuit essentially revolves around two federally registered trademarks held by Plaintiff: "KIIS" and "KISS FM." To succeed on a trademark infringement claim, a party must show: "(1) that its mark has priority and (2) that the defendant's mark is likely to cause consumer confusion." *Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 122 F.3d 1379, 1382 (11th Cir.1997). Plaintiff seeks to enjoin Defendants' use of "KISS" under either one of Plaintiff's marks. In response, Defendants first contend that KISS 104 is unlikely to be confused with KIIS. Secondly, Defendants maintain that its KISS 104 moniker ("moniker" is synonymous with "station name") possesses seniority over Plaintiff's KISS FM mark. I will address each argument in turn.

### 1. *Likelihood of Confusion Between KIIS and KISS 104*

■ The Eleventh Circuit prescribes a multi-factored analysis for determining likelihood of trademark confusion. The test is comprised of the following components: "(1) type of mark, (2) similarity of mark, (3) similarity of the products the marks represent, (4) similarity of the parties' retail outlets and customers, (5) similarity of advertising media used, (6) defendant's intent and (7) actual confusion." *Id.* The type of mark and actual confusion are the two most important factors. *Id.*

The type of mark is a measure of the trademark's strength, and it falls into one of four categories: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary. *Frehling Enter., Inc. v. Int'l Select Group, Inc.,* 192 F.3d 1330 (11th Cir.1999) "The categories are based on the relationship between the name and the service or good it describes." *Id.* A generic mark is the weakest because it refers to a general class of goods or services. *Id.* A generic term is incapable of being registered. *Id.* "Descriptive marks describe a characteristic or quality of an article or service." *Id.* A suggestive mark indicates a characteristic of the good or service and requires the consumer to make an inferential step to associate the term with the product. *Id.* Finally, an arbitrary mark holds no logical connection to the good or service. *Id.* Arbitrary marks are the strongest. *Id.* at 1335–36.

KIIS qualifies as a strong mark for other reasons. Plaintiff's predecessor received registration in 1989. Five years later, the mark became "incontestable" under the trademark laws. 15 U.S.C. § 1065. Although the incontestable status usually gives the mark's holder certain evidentiary rights, *see* 15 U.S.C. § 1115(b), it also plays a role in the likelihood of confusion analysis. Under the "type of mark" factor, an incontestable mark is "presumed to be at least descriptive with secondary meaning." *Dieter v. B & H Indus. of Southwest Fla., Inc.,* 880 F.2d 322, 329 (11th Cir.1989). Accordingly, KIIS is a "relatively strong mark." *Id.*

The next factor presents greater difficulties. Under the "similarity of the marks" prong, "the court compares the marks and considers the overall impression that the marks create, including the sound, appearance, and manner in which they are used." *Frehling Enter.,* 192 F.3d at 1337. At first glance, "KIIS" and "KISS 104" would seem dissimilar. Be-cause KIIS is not a word, its normal pronunciation would be "kay-aye-aye-ess." In fact, Plaintiff's Los Angeles station uses this pronunciation in the hourly call-letter identification required by the Federal Communications Commission. (Pl.'s Br. Opp. to Defs.' Motion for Prelim. Inj. at 17.) Plaintiff contends, however, that the regular station identifiers, or sweepers, pronounce "KIIS" as "kiss." (Second Compton Decl. ¶ 4.) Defendants do not dispute this contention.

Because radio is an aural medium, sound and use of a mark largely determine its similarity to other marks. Both KISS 104 and KIIS are used to identify radio stations. Although Plaintiff pronounces "KIIS" as "Kay-aye-aye-ess" once an hour for station identification, the sweepers pronounce "KIIS" as "KISS" nearly twenty times an hour throughout the day. (*Id.*) Consequently, the predominant pronunciation of "KIIS" mirrors Defendants' pronunciation of "KISS 104." Considering the medium, this common pronunciation makes the marks highly similar. However, Defendants present other grounds for finding dissimilarity.

According to Defendants, the representations of Plaintiff's predecessor preclude a finding of similarity. Plaintiff's predecessor, Gannett Co., Inc., applied for registration of "KIIS." Initially, the United States Patent and Trademark Office refused registration. The basis for the Trademark Office's decision was that the pronunciation of "KIIS" was confusingly similar to two other trademark applications, "KISS and Design" and "KISS RADIO." In a letter titled "RESPONSE TO OFFICIAL ACTION," Gannett argued that the Trademark Office applied the likelihood of confusion analysis too narrowly. Because KIIS operated in a different market than the two other applicants, Gannett argued that there was no possibility for

**1378**

confusion. Now, Defendants maintain that under the doctrine of statutory estoppel, Gannett's representations bind Plaintiff.

 Specifically, Defendants contend that statutory estoppel prevents Plaintiff from asserting that "KISS 104" infringes upon the "KIIS" trademark. Statutory estoppel is comprised of three elements:
 (1) assertion by a party of entitlement to statutory right or privilege;
 (2) the receipt by that party of an actual benefit pursuant to the statute;
 (3) subsequent assertion by that party which is inconsistent with entitlement to the statutory benefit previously received.

*Technicon Med. Info. Sys. Corp. v. Green Bay Packaging, Inc.*, 687 F.2d 1032, 1034 (7th Cir.1982). Assuming Defendants could prevail on the first two factors, they cannot establish the third. Plaintiff's predecessor made its geographic argument under an entirely different set of rules governing media ownership. At the time, federal regulations prohibited a company from owning more than twelve AM and twelve FM radio stations in the United States. Gannett's representations to the Patent and Trademark Office cited these restrictions. The 1996 Telecommunications Act, however, allowed for increased ownership of radio stations.

 In addition, registration gives the trademark holder rights throughout the nation. The Lanham Act contemplates the "natural" expansion of a trademark holder's business into areas currently unserved or served by potential infringers. *Howard Stores Corp. v. Howard Clothing, Inc.*, 308 F.Supp. 70, 73 (N.D.Ga.1969). The KIIS registration places no conditions on its use, and it is apparent that Plaintiff's predecessor intended "KIIS" to be pronounced "kiss." (*See* Dabney Decl. Ex. 1 ("Refusal of registration was premised solely upon the perception that the mark KIIS, when pronounced, sounds confusingly similar to the pending applications for registration of KISS and Design and KISS RADIO and Design" (citations omitted))). For these reasons, I cannot find any inconsistency in Plaintiff's current position. I also find that the "KIIS" mark is similar to "KISS 104."

 The next step in the likelihood of confusion analysis is to assess the similarity of the goods. Under this factor I must decide "whether the products are the kind that the public attributes to a single source, not whether or not the purchasing public can readily distinguish between the products of the respective parties." *Frehling Enter.*, 192 F.3d at 1338. In this case, a radio listener "could possibly attribute the [services] here to the same source." *Id.* Plaintiff alleges the programming of KIIS and KISS 104 overlap. (Scott Decl. ¶ 9.) Although the programming format may differ slightly, a listener could assume one company operates both stations upon hearing the "KISS" name at two different positions on the radio dial. This conclusion is bolstered by the evidence related to radio listener surveys. A company named Arbitron periodically conducts listener surveys to determine a station's ratings. Radio stations set their advertising fees based on these ratings. According to Plaintiff, "the typical Arbitron diarist identifies a given radio station by its moniker, rather that its call letters or dial position." (*Id.* ¶ 13.) Consequently, a listener could reasonably conclude that two stations using "KISS" have a common owner.

When determining the similarity of retail outlets and customers, the court analyzes "where, how, and to whom the parties' products are sold." *Frehling Enter.*, 192 F.3d at 1339. An identity of customers is not required; the parties need only "cater to the same kinds of individuals." *Safeway Stores, Inc. v. Safeway Discount Drugs*, 675 F.2d 1160, 1166 (11th Cir.1982).

Obviously, both parties provide radio broadcast services. Nevertheless, KIIS is broadcast over the XM Band using satellite technology. This method allows anyone in the United States to receive KIIS's broadcast with the proper equipment. KISS 104, on the other hand, uses FM radio waves and is limited to the Savannah area. According to Plaintiff, KIIS and KISS 104 target similar audiences. Although the breadth of XM Band customers is not highlighted in the record, I find the similarity in format, geography, and audience sufficient to weigh in favor of a likelihood of confusion.

The parties present little evidence regarding the similarity of advertising media. Plaintiff claims that the parties' advertising will "inevitably overlap." (Pl.'s Br. Temp. Restr. Order at 13.) This argument, however, seems stronger for Plaintiff's other mark, KISS FM. Neither party has produced any evidence regarding KIIS and KISS 104. Accordingly, this factor does not create a greater likelihood of confusion.

Finally, Plaintiff has also presented little evidence of Defendants' intent or actual confusion between KIIS and KISS 104. Plaintiff claims that Defendants possessed constructive knowledge of the KIIS mark as early as 1989 the year it was registered. But constructive knowledge fails to qualify as evidence of intent. Additionally, Plaintiff's evidence regarding actual intent is more relevant to the KISS FM mark than KIIS. These factors also present little support for a likelihood of confusion.

Overall, I find a likelihood of confusion between KIIS and KISS 104. KIIS is a strong mark that is similar to KISS 104. When hearing the KIIS and KISS 104 stations on their radios, listeners could assume the stations are operated by a common owner. Although there is no evidence of actual confusion or Defendants' intent, the XM Band is an infant technology spreading throughout the United States. The XM Band also can be received in Savannah, and radio listeners could potentially hear both KIIS and KISS 104 in the same market. Accordingly, a likelihood of confusion exists.

### 2. Infringement of the KISS FM Trademark by KISS 104

#### a. Likelihood of Confusion

The parties do not dispute the likelihood of confusion between Plaintiff's KISS FM mark and Defendants' KISS 104 mark. Although KISS FM is contestable, its arbitrary relationship to radio broadcasting makes it a strong mark. KISS FM and KISS 104 are also similar and share the same retail outlet and customers. Additionally, Plaintiff's argument about the inevitability of common advertising media has more force with the KISS FM mark. Plaintiff is using the KISS FM mark for its WAEV–97 FM station in Savannah. WAEV–97 FM, popularly known as 97 KISS FM, directly competes with Defendants' KISS 104 station. Finally, Defendants have submitted evidence of actual confusion between 97 KISS FM and KISS 104. (Nelson Dec. ¶ 2; Thomas Decl. ¶ 8.) A likelihood of confusion exists between 97 KISS FM and KISS 104.

#### b. Seniority

 Defendants contend that KISS 104 has seniority over Plaintiff's KISS FM mark. According to the official registration, Plaintiff's predecessor began using the KISS FM mark as early as June 1996. (Compton Decl. Ex. 2.) KISS FM was officially registered on May 12, 1998. In October or November of 1998, Defendants began operating WSIS–104 FM in Savannah as KISS 104. Defendants argued at the hearing, however, that they were using a variation of the "KISS" moniker in Myrtle Beach, South Carolina well before

Plaintiff's predecessor sought registration of the KISS FM mark. (Brown Decl. ¶ 2.)

■ Defendants maintain that their prior use of KISS in Myrtle Beach affords them seniority over Plaintiff's use of the KISS FM mark in Savannah. Normally, registration of a trademark is prima facie evidence of "the registrant's exclusive right to use the registered mark in commerce." 15 U.S.C. § 1057(b). Registration also confers "a right of priority, nationwide in effect, ... against any other person." § 1057(c). These rules are subject to certain exceptions, and a trademark may also be canceled. *Coach House Rest. v. Coach and Six Rest.*, 934 F.2d 1551, 1557 (11th Cir.1991). A person can move to cancel a mark if he shows use of a similar mark prior to registration. *Id.* at 1559; *see also* § 1115(b)(5) (setting forth priority of use as a defense to an "incontestable" mark). Defendants' prior use of "KISS" in Myrtle Beach would seemingly prevent Plaintiff's use of the mark in Savannah. However, the rules governing cancellation must be read against the broader background of the Lanham Act.

■ Geography, and more specifically—geographic markets—are a significant consideration in trademark disputes. As mentioned, registration gives a trademark holder nationwide rights in the mark. § 1057(b)-(c). Nevertheless, the holder does not automatically receive the right to enjoin every infringer from using similar marks.

'[I]f the use of the marks by the registrant and the unauthorized user are confined to two sufficiently geographically separate markets, with no likelihood that the registrant will expand his use into defendant's market, so that no public confusion is possible, then the registrant is not entitled to enjoin the junior user's use of the mark.'

*American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619, 626 (5th Cir.1963)

(quoting *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358 (2nd Cir.1959)). However, the registrant may move for an injunction after he enters the same geographic market and a likelihood of confusion exists. *Id.* at 627. This rule reflects the Lanham Act's recognition that trademark holders often expand their businesses beyond the original geographic market. *John R. Thompson Co. v. Holloway*, 366 F.2d 108, 115 (5th Cir.1966). Although these principles do not necessarily resolve Defendants' argument, they do provide insight.

Defendants may have seniority over Plaintiff in Myrtle Beach, but that seniority does not extend to Savannah. Only federal registrants enjoy nationwide priority. § 1057(c). Consequently, Defendants' prior use of "KISS" in Myrtle Beach did not create a nationwide right. With the exception of the XM Band, radio markets are generally limited by the scope of the broadcast area. Plaintiff presents no evidence that the Myrtle Beach market encompasses Savannah. Accordingly, Savannah is the relevant market.

A simple chronology of events demonstrates Plaintiff's seniority. Plaintiff's predecessor began operating a KISS station as early as June 1996. The predecessor filed for registration of the KISS FM mark in 1997, and registration was approved in May 1998. Defendants admit that they did not begin broadcasting in Savannah as KISS 104 until October or November of 1998. Consequently, Defendants' operations in the Savannah market were always subject to Plaintiff's entry and use of its registered KISS FM mark. When Plaintiff began operating WAEV–97 FM as 97 KISS FM on December 14, 2001, it was the first time Plaintiff could assert its rights in Savannah. *American Foods*, 312 F.2d at 626. The combination of likely confusion and Plaintiff's superior rights creates a substantial likelihood of Plaintiff's success on the merits.

### B. A Substantial Threat of Irreparable Injury

 Without a preliminary injunction, Plaintiff will face a significant threat of irreparable injury. In general, "a sufficiently strong showing of likelihood of confusion may by itself constitute a showing of ... a substantial threat of irreparable harm." *E. Remy Martin & Co. v. Shaw–Ross Int'l Imports*, 756 F.2d 1525, 1530 (11th Cir.1985). The likelihood of confusion between 97 KISS FM and KISS 104 is great. As discussed, a radio station generates its advertising revenue based upon periodic listener surveys. The listeners often identify a station based upon its name as opposed to its dial position or call letters. (Scott Decl. ¶ 13.) With two KISS stations operating in the same market, listeners have already experienced confusion. (Thomas Decl. ¶ 8.) This confusion will likely have a negative impact upon the ratings of Plaintiff's station. This development, in turn, will lower the rates Plaintiff can charge advertisers. At the hearing, Plaintiff's witnesses also testified that Plaintiff needs the time before the next ratings period to boost its audience and spread its name. The next ratings period falls approximately in March. Discovery, dispositive motions, and a possible trial will extend far beyond that date. Additionally, Plaintiff conducts nationwide advertising campaigns in support of the nearly forty stations which use the "KISS" name. Defendants' operations could undermine this scheme and Plaintiff's "KISS" brand name. (Compton Decl. ¶ 10.) For these reasons, I find that Plaintiff will suffer irreparable harm if Defendants' operations are not enjoined.

### C. Whether Injury to Plaintiff Outweighs Injury to Defendants

 Although Defendants would be harmed by a preliminary injunction in Plaintiff's favor, Plaintiff would experience greater injury. Plaintiff has developed a network of nearly forty KISS stations throughout the United States. (Compton Decl. ¶¶ 9–10.) Plaintiff promotes its KISS stations in national trade magazines, and it produces programming and announcements which are shared among its forty stations. (*Id.* ¶¶ 10, 12.) Plaintiff also has developed a concert series for its KISS network. (*Id.* ¶ 12.) In 2000, Plaintiff spent $9,000,000 promoting its KISS stations. (*Id.* ¶ 9.) Defendants' continued operation of an infringing KISS station will undermine this scheme.

More importantly, Plaintiff will also suffer significant injury in the Savannah market. Plaintiff decided to launch the KISS format in December because it coincided with the end of the autumn ratings period. (Hearing Trans. at 36.) According to a vice-president of Plaintiff's parent corporation, Plaintiff needs the time before the spring ratings period to boost the name recognition of 97 KISS FM. (*Id.* at 36–37.) Consequently, the present time is a critical period for Plaintiff. Another KISS station operating in the same market poses the likely possibility of diluting Plaintiff's ratings. Listeners often identify a station based upon its station name, not its call letters or dial position. (Scott Decl. ¶ 13.) Additionally, Defendants' witness admitted that sudden, unannounced format or name changes are common in the radio business. (Hearing Trans. 99–100.) Prohibiting Plaintiff from using its KISS trademark in Savannah will skew its station's ratings and could lead to a substantial loss of goodwill and revenue.

Defendants will be harmed, but the equities favor Plaintiff. Defendants' KISS 104 station enjoys significant name recognition and goodwill in Savannah. (*Id.* at 93.) It has operated this station as KISS 104 for over three years. In addition,

Defendants have invested substantial sums of money in promoting KISS 104. Nevertheless, Defendants used the "KISS" name without authorization from Plaintiff. As summarized by a leading trademark authority, "[t]he federal registrant obtains this important right: the right to preempt all post-registration junior users in the nation once the registrant expands into a territory." J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 26:33 (4th ed.2001). In other words, the junior user is "living on borrowed time." *Id.* Well before this lawsuit was filed, Defendants had notice of Plaintiff's federally registered KISS marks. The Executive Vice President of Defendant Cumulus Media, Inc., John Dickey, admitted that he knew of these marks as early as the spring of 2000. (Hearing Trans. at 149.) Despite this knowledge, Defendants continued to operate WSIS–104 FM in Savannah as "KISS 104." A preliminary injunction will be damaging to Defendants, but they cannot claim an absence of warning. Finally, a preliminary injunction does not prevent Defendants from operating WSIS–104 FM under a different name. For these reasons, I find the harm to Plaintiff outweighs the harm to Defendants.

### D. The Public Interest

The parties do not dispute the final element in the preliminary injunction standard. "[T]he public interest in preventing confusion around the market place is paramount." *Coach House Rest.*, 934 F.2d at 1564. As indicated above, two radio stations using the "KISS" name has already caused confusion in the Savannah market. (Nelson Dec. ¶ 2; Thomas Decl. ¶ 8.) A preliminary injunction will serve the public interest by eliminating this disruption.

### V. Relief

Plaintiff's Motion for a Preliminary Injunction (Doc. No. 6–2) is **GRANTED**, making its Motion for a Temporary Restraining Order (Doc. No. 6–1) **MOOT.** Defendants' Motion for a Preliminary Injunction (Doc. No. 13) is **DENIED.** As of the date this Order is filed, Defendants are enjoined from using "KISS" to identify or promote WSIS–104 FM in Savannah, Georgia. In addition, Defendants are enjoined from using "KISS" in the domain name of WSIS's website and email address. **ORDER ENTERED** at Augusta, Georgia, this *4th* day of March, 2002.